Argued and submitted September 7, 2006, judgment of conviction
and sentence of death affirmed April 19, 2007

# STATE OF OREGON,
*Plaintiff on Review,*

*v.*

# JESSE LEE JOHNSON,
*Defendant on Review.*

## (CC 98C46239; SC S51313)

157 P3d 198

Ingrid A. MacFarlane, Portland, argued the cause and filed the briefs for defendant on review.

Kathleen Cegla, Assistant Attorney General, Salem, argued the cause and filed the brief for plaintiff on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before, De Muniz, Chief Justice, and Carson, Gillette, Durham, Balmer, and Kistler, Justices.*

KISTLER, J.

---

* Riggs, J., retired September 30, 2006, and did not participate in the consideration or decision of this case. Carson, J., retired December 31, 2006, and did not participate in the decision of this case. Walters and Linder, JJ., did not participate in the consideration or decision of this case.

## KISTLER, J.

This case is before us on automatic and direct review of defendant's judgment of conviction and sentence of death. *See* ORS 138.012 (providing for direct review in the Supreme Court when the jury imposes a death sentence). On review, defendant assigns error to 23 of the trial court's rulings. For the reasons set out below, we affirm defendant's conviction and sentence of death.

■ Because the jury found defendant guilty, we state the facts in the light most favorable to the state. *State v. Gibson*, 338 Or 560, 562, 113 P3d 423, *cert den*, 126 S Ct 760 (2005). On March 20, 1998, the victim was found lying on her living room floor, stabbed to death. An acquaintance of the victim told the police that defendant had been in the victim's home the day before she was murdered.[1] Another witness reported seeing a person who matched defendant's appearance walk away from the victim's home shortly after the murder. Police officers later found defendant's fingerprints in the victim's home.

On March 27, seven days after the victim's death, two police officers arrested defendant for a probation violation. When the officers arrested him, they seized his jacket, which was similar to the one that the person walking away from the victim's home had been wearing. Before leaving with the officers, defendant put on a pair of heavy work boots. One officer noticed that the pattern on the soles of defendant's boots was consistent with a shoe impression found in blood at the crime scene.

After they arrived at the police station, the officers advised defendant of his *Miranda* rights and spoke with him concerning the murder. During their conversation, defendant admitted that he had known the victim but maintained that he never had been to her home even after the officers told him that his fingerprints had been found there. After the interview, the officers seized defendant's clothing and boots,

---

[1] The police determined that the victim had been killed during the early morning hours of March 20, 1998, when the victim's neighbors heard screams for help coming from her apartment.

placed them in an evidence locker, and booked defendant into the Yamhill County Jail on the probation violation charge.

One of the officers interviewed defendant a second time on April 17, 1998. By that time, the police had spoken with a number of people who had reported seeing defendant in possession of the victim's jewelry shortly after her death. One of those witnesses told the police that defendant had showed him some of the victim's jewelry and then said, "I offed the bitch to rob her." When the officer asked defendant whether the witness was lying when he reported that defendant had made that statement, defendant replied, "No, he's not."

The state charged defendant with aggravated murder on June 25, 1998, and trial was set to begin on September 8, 1999. Before trial, defendant moved to suppress some of the state's evidence, including the clothing and boots that the officers had seized during their first interview with him. On August 20, 1999, the trial court suppressed that evidence, reasoning that the officers did not have a warrant to seize defendant's clothing and that the inevitable discovery doctrine did not apply. The state pursued two pretrial appeals regarding the seized clothing. Neither appeal was successful. The case against defendant went to trial on March 8, 2004, and the jury found him guilty of aggravated murder and sentenced him to death.

As noted, defendant assigns error to 23 of the trial court's rulings. Among other things, defendant argues that the trial court erred in denying his motion to prevent the officers from commenting at trial on his invocation of his constitutional right to silence, in denying his motions to dismiss the charges because the state denied his statutory and constitutional rights to a speedy trial, and in ruling that, if defendant presented expert testimony regarding footprints left at the crime scene, he would open the door to the introduction of evidence that the trial court had suppressed. We discuss those rulings below and affirm without further discussion the remainder of the rulings to which defendant assigns error.[2]

---

[2] We have considered all of defendant's other assignments of error. Any assignment of error or issue not discussed in this opinion either has been discussed by this court in previous cases and resolved against defendant's position, was not

We begin with defendant's argument that, at trial, the officers impermissibly commented on the exercise of his right to remain silent. Defendant filed a pretrial motion to suppress statements that he had made to police officers on March 27 and April 17, 1998. He contended that he had not knowingly and intelligently waived his rights under *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). At the hearing on that motion, the state offered evidence that the officers had advised defendant of his *Miranda* rights and that he had spoken with them after receiving that advice.

The evidence at the hearing also revealed that defendant had not answered all the officers' questions. Sometimes, defendant had responded, "I don't know what you're talking about." Other times, defendant would pause, the officers would repeat or clarify the question, and then defendant would respond. Still other times, defendant would simply remain silent in response to a question. Ultimately, defendant told the officers that he did not want to talk to them anymore and, after that point, made no further statements.

After the hearing on his suppression motion, defendant filed a supplemental memorandum based on the officers' testimony during the hearing. In that memorandum, defendant identified specific instances in which he had remained silent in response to the officers' questions. Defendant argued that evidence of his silence was not admissible for two reasons. First, he contended that his silence did not qualify as an adoptive admission under the Oregon Evidence Code. Alternatively, he argued that introducing evidence of his silence at trial would be an impermissible comment on the exercise of his constitutional right to remain silent.

The state argued, in response to the evidentiary issue raised in petitioner's supplemental memorandum, that it intended to introduce evidence of his silence only for the purpose of proving that his statements to the officers were voluntary. On the constitutional issue, the state argued that defendant's silence, when viewed in context, did not constitute an invocation of his right to remain silent. The state reasoned:

preserved at trial, or is not well taken. Further discussion of those issues would not benefit the public, bench, or bar.

"Your honor, I guess what it boils down to on this issue is that the State is asking you to look at all of the circumstances, to recall that the defendant was able to and did exercise certain of his rights or at least rights that he perceived that he had and to, from that, infer that the defendant was not engaging in an invocation of his right to silence when he was not responding to certain questions but was rather simply pausing before answering questions and thinking about them, which is really what I believe the record reflects * * *."

The trial court accepted the state's argument on the constitutional issue and "f[ound] that the defendant did not implicitly invoke his right to remain silent." The court was concerned, however, that testimony regarding defendant's silence, even if relevant to prove voluntariness, was more prejudicial than probative. Applying that standard, the trial court ruled that two instances of defendant's silence in response to the officers' questions were admissible but that the other instances of silence that counsel had identified were not.[3]

At trial, the officer who had interviewed defendant did not testify regarding the two instances of silence that the trial court had ruled would be admissible, nor did he testify regarding any other instance of silence that defendant had identified in his supplemental memorandum. Rather, the officer testified as follows:

"Well, the first thing that I told [defendant] was—was that we've continued to investigate this; we've developed more information. And I just simply told him 'I don't have any doubt you were there. I think you were there at the time of the homicide. And—you know—the issue with us is that we at this point need to know what your involvement is.' While I'm talking with him saying, 'Hey. I need to talk to you about a murder,' he is almost casual in his appearance. He's got his arms crossed. He's looking away, down, kind of off to the side of his lap. He would be nonresponsive to some statements and questions, so I'd have to repeat them to get

---

[3] Specifically, the trial court ruled that the officers could admit evidence (1) that defendant had remained silent in response to a statement that the officers had found defendant's fingerprints at the victim's house and (2) that he had remained silent when asked "w[h]ere he had gotten the [victim's] earrings." The trial court excluded two other instances in which the defendant had remained silent.

him to respond to me. I told him that—you know—'Hey. I really need to talk to you about this situation. And I know you were there when this happened.' And his response to that was to say, 'I don't know what you're talking about.' And I would follow that up with, 'Well, I'm talking about a murder. I'm talking where someone has been stabbed to death. Someone has stolen her jewelry, and people are saying you're the one involved in that.' And he would say, 'I don't know what you're talking about.' "

■ The issue that defendant raises on review is narrow. He does not argue that, when he remained silent in response to the officers' questions, he invoked his right to silence and all questioning therefore had to stop. *Cf. State v. Longo*, 341 Or 580, 592-93, 148 P3d 892 (2006) (recognizing that selective refusal to talk on some subjects did not foreclose questioning on other subjects). Rather, he argues that his intermittent silences were selective invocations of his constitutional right to remain silent and that, when the officer testified at trial that he had remained silent in response to the officers' questions, the officer impermissibly commented on defendant's invocation of his constitutional right to remain silent.

One difficulty with defendant's argument is the factual premise that underlies it. The officer did not testify at trial that defendant remained silent in response to his questions. Rather, he testified that defendant hesitated and then answered. The officer told the jury that defendant "would be non-responsive to some statements and questions, so I'd have to repeat them to get him to respond to me." The officer went on and set out defendant's responses to his questions— responses in which defendant denied any knowledge of the events to which the officer referred. Far from testifying that defendant remained silent in the face of questions, the officer testified only that defendant paused before responding.

At the hearing on defendant's supplemental memorandum, defendant's counsel explained that he purposefully had omitted from the memorandum "situations of testimony where the defendant sat, thought, and then gave a response." Defense counsel added, "If the State wants to introduce evidence during this trial that defendant sat and thought about things before he answered, I don't see a problem with that." It

appears from the limited testimony that the officer gave at trial that the state did precisely what the defense invited it to do; it offered testimony that, in response to the officer's questions, defendant sat, thought, and then responded.[4] In any event, because the officer did not testify that defendant remained silent in response to his questions, his testimony was not a comment on defendant's silence, much less a comment on defendant's exercise of his constitutional right to remain silent.[5]

Defendant's fifth and sixth assignments of error challenge the trial court's rulings denying his two motions to dismiss the case for lack of a speedy trial. As noted, the state indicted defendant for aggravated murder on June 25, 1998. On July 13, 1999, defendant filed a motion to suppress several pieces of evidence, including the clothing and boots that the officers had seized during their first interview with him. On August 20, 1999, the trial court suppressed the clothing and boots, finding that "the detectives seized defendant's clothing without a warrant and without exigent circumstances." The court also rejected the state's argument that it inevitably would have obtained the clothing, ruling that "inevitable discovery [was] inapplicable to the facts and evidence in this case."

On September 30, 1999, the state appealed the trial court's pretrial order. The state conceded that the officers had obtained the evidence illegally but argued that the trial court erred in concluding that the inevitable discovery doctrine did not apply. *State v. Johnson*, 177 Or App 244, 247, 35 P3d 1024 (2001) (*Johnson I*). The state contended that the jail staff would have inventoried (and thus seized) defendant's clothing at the jail if the officers had not illegally seized the clothing earlier. *Id.* at 250. It followed, the state reasoned, that the inevitable discovery doctrine applied. *Id.* The Court

---

[4] It is telling (and perhaps independently fatal to defendant's assignment of error) that, when the officer testified at trial, defendant did not object to his sanitized testimony even though it differed from the testimony to which defendant had objected in his pretrial supplemental memorandum.

[5] Not every act of silence constitutes an invocation of a person's constitutional right to remain silent. Given our disposition of defendant's second assignment of error, we need not decide whether defendant's intermittent silences constituted selective invocations of his right to remain silent.

of Appeals disagreed, concluding that, even if jail staff would have inventoried defendant's clothes after his arrest and seized them temporarily for that purpose, the state had failed to show that the jail staff would have seized that clothing for all the purposes of a criminal investigation, such as forensic testing. *Id.* at 252. Accordingly, on October 17, 2001, the Court of Appeals affirmed the trial court's order suppressing the evidence.

While the state was pursuing its appeal, it applied to the trial court for a search warrant authorizing the seizure of the boots and clothes. That court issued the warrant, authorizing the police to seize and analyze the clothing "located at the Salem Police Department." After the state lost its appeal, it did not petition for review of the Court of Appeals decision. It chose instead to rely on the seizure pursuant to the warrant. Defendant then moved to suppress the evidence seized pursuant to the warrant. He argued that the police officers were able to locate the clothing and boots for the purpose of executing the warrant only because of their earlier, illegal seizure of that evidence. The trial court agreed and again suppressed the evidence.

On October 18, 2002, the state appealed directly to this court from the second order suppressing evidence.[6] On appeal, the state argued that the officers had an independent source for the information that led to the issuance and execution of the warrant. *State v. Johnson,* 335 Or 511, 519, 73 P3d 282 (2003) (*Johnson II*).

On July 24, 2003, this court upheld the trial court's order. *See id.* at 511. The court began by examining the question, previously unanswered in state law, of how the burdens of production and persuasion should be allocated when the state claims that a warranted search or seizure is not the product of an earlier illegality. *Id.* at 519-21. This court concluded that, if a defendant meets the burden of "establishing a 'factual nexus' between the unlawful police conduct and the challenged evidence," then the burden of persuasion shifts to the state to prove that the evidence was not tainted by the unlawful conduct. *Id.* at 520-21.

---

[6] Between the state's first and second appeals, the legislature enacted ORS 138.060(2), which provides for a direct appeal to the Supreme Court when a trial court enters a pretrial order suppressing evidence in a murder case.

After this court determined that the trial court correctly had allocated the burdens of production and persuasion, it considered whether the evidence supported the trial court's conclusion that the state had failed to meet its burden of persuasion that the seizure of the evidence pursuant to the warrant was not a product of the earlier illegality. *Id.* at 522-23. On that issue, the court reviewed the evidence before the trial court and concluded that, although the trial court could have found that the state had met its burden of persuasion, it could not say as a matter of law that the trial court erred in finding otherwise. *Id.* at 523-26. Accordingly, the court affirmed the trial court's order suppressing the evidence that the state had seized pursuant to the warrant. *Id.* at 526.

Immediately after this court issued its decision in *Johnson II*, the trial court offered defendant a trial date of November 10, 2003. Defendant agreed to postpone the trial further, pushing it back to February 2004. In October 2003, defendant filed a pretrial motion to dismiss for lack of a speedy trial, arguing that the state had violated his rights under ORS 135.747, Article I, section 10, of the Oregon Constitution, and the Sixth Amendment to the United States Constitution.

After a hearing on the motion to dismiss, the trial court found that the "lion's share" of the pretrial delay had been caused by two unsuccessful and "unduly lengthy" state's appeals. The court noted that the first appeal took nearly two years and found that the state's attorney assigned to the case had failed to give the appeal the "highest priority," working instead on "a number of less serious cases in lieu of this case." The court found that the second appeal "was poorly timed, of questionable value and added eighteen months to an already unnecessarily long pretrial delay." Although the court questioned the value of the state's two pretrial appeals, it denied defendant's motion to dismiss. It found that defendant had failed to prove that the delay had prejudiced him. The court reasoned:

> "Although the length of the delay and the reasons for the delay analysis suppor[t] Defendant's motion, the Court finds the prejudice prong has not been met. Facts supporting a finding of actual prejudice are likely to become apparent only following trial, when a comprehensive analysis can be made of the evidence still available following delay."

After the guilt phase but before the penalty phase of his trial, defendant renewed his motion to dismiss, arguing once again that the state had denied his right to a speedy trial. Defendant based his motion in part on what he characterized as "the testimony contained in the record regarding numerous instances of faded or absent memories of witnesses." He also based it on missing evidence regarding cigarette butts and a photo throw-down. In support of his motion, defendant filed an affidavit describing the ways in which the delay had "substantially affected [his] physical and mental well-being." The affidavit referred, among other things, to trouble sleeping due to the stress of being in jail, weight loss due to anxiety, the loss of "important family members" and "all hope," and trouble concentrating on helping his attorney with the case.

The trial court denied defendant's second motion for the same reasons that it had denied his first motion—the failure to prove prejudice. On that point, the court found that defendant's anxiety was not atypical for someone facing the death penalty, that defendant was not having trouble sleeping, and that he had not demonstrated that the evidence that he identified as missing or lost was either material or favorable. On review, the parties renew the arguments that they made below.

■ When a defendant charged with murder raises statutory and constitutional speedy trial claims, we reverse our usual order of analysis and consider the constitutional claims first. *State v. Harberts*, 331 Or 72, 81, 11 P3d 641 (2000). We do so because a defendant who prevails on a constitutional speedy trial claim is entitled to dismissal with prejudice. *Id.* When a defendant who is charged with murder prevails on a statutory speedy trial claim, he or she is entitled only to dismissal without prejudice and faces the prospect of another prosecution for the same crime. *Id.* Accordingly, we begin with defendant's state constitutional claim.

■■ Article I, section 10, of the Oregon Constitution provides, in part, that "justice shall be administered * * * without delay." Even though that provision refers broadly to the administration of justice, this court has held that it is "similar" to the command contained in the Sixth Amendment that,

"[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy * * * trial." *State v. Mende,* 304 Or 18, 22, 741 P2d 496 (1987); *see also Harberts,* 331 Or at 81-86 (describing the two provisions as substantially the same). The two provisions are not identical, however. *See Haynes v. Burks,* 290 Or 75, 80, 619 P2d 632 (1980) (so noting). For instance, a defendant's failure to invoke his or her right to a speedy trial is neutral in the state constitutional analysis while the failure to invoke the federal right can weigh against a defendant. *Id.*

██ Even though a pretrial appeal is part of the administration of justice, an undue and "wholly unjustified" delay in prosecuting a pretrial appeal can result in the denial of a defendant's rights under Article I, section 10. *See Haynes,* 290 Or at 90 (so stating); *accord Harberts,* 331 Or at 89-91. In assessing the effect of the delay, the court considers both the length of the delay and the reasons for it. When the state pursues a reasonable pretrial appeal with diligence, the delay will weigh only slightly against the state. *See Harberts,* 331 Or at 90 (stating proposition). On the other hand, the delay resulting from a pretrial appeal will weigh more heavily against the state if considerable delay already has occurred, if the state lacks a "strong justification" for the appeal, and if the state fails to give the appeal sufficient priority. *See id.* at 91-93 (stating those propositions).

██ In determining whether a defendant's constitutional right to a speedy trial has been impaired sufficiently to warrant dismissing the charges against him or her, a court also must consider the prejudice to the defendant. *State v. Tiner,* 340 Or 551, 555, 135 P3d 305 (2006). More specifically, a court

> "must assess prejudice to the defendant in light of the interests that the speedy-trial requirement was designed to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize the anxiety and concern of the criminally accused; (3) and to limit the possibility that the defense will be impaired."

*Id.* When a defendant proves that "the delay caused a 'reasonable possibility of prejudice' to the ability to prepare a defense," that will weigh in the defendant's favor. *Harberts,*

331 Or at 86 (quoting *State v. Ivory*, 278 Or 499, 508, 564 P2d 1039 (1977)); *see also Haynes*, 290 Or at 82 (indicating that something more "concrete" is called for if trial has occurred). However, when the value of unavailable evidence is only speculative, the unavailability of that evidence will not factor significantly in the analysis. *See Tiner*, 340 Or at 557-58 (loss of witness's unknown testimony not sufficient to warrant dismissing charges); *State v. Emery*, 318 Or 460, 473-74, 869 P2d 859 (1994) (same).

This court is bound by a trial court's findings of historical fact if there is evidence in the record to support them. *Johnson II*, 335 Or at 523. Accordingly, the trial court's findings of fact concerning the length and reasons for the delay, as well as the type, level, and cause of any anxiety that defendant suffered, are binding if supported by evidence. *See Harberts*, 331 Or at 94 (so indicating). How those findings of historical fact factor into the constitutional analysis presents a question of law. *See id.* at 91-92 (so indicating).

In this case, the grand jury indicted defendant on June 25, 1998. *See State v. Vasquez*, 336 Or 598, 612-13, 88 P3d 271 (2004) (explaining that the period for assessing a speedy trial claim begins when the state initiates criminal charges against a defendant by indictment or its equivalent). Trial began on March 8, 2004. The period between indictment and trial was five years and eight months. Defendant does not argue that the state intended to hamper his defense through delay or that the delay was so long that it is sufficient, without more, to establish a violation of his speedy trial rights. *See Harberts*, 331 Or at 86 (recognizing those bases for proving a speedy trial violation). The delay, however, is "substantially greater than the average." *See Mende*, 304 Or at 23-24. Accordingly, we consider the reasons for the delay and the prejudice to the defendant, bearing in mind that the length of the delay weighs against the state. *See id.* (following similar course).

We accept the trial court finding of historical fact that the "lion's share" of the delay in this case stems from the state's two appeals.[7] The question of law for this court,

---

[7] The trial court initially scheduled trial for September 1999, 14 months after the indictment. Defendant did not file his first motion to suppress the clothing

however, is whether the state acted unreasonably and without a sufficient justification in pursuing the two appeals. *See id.* at 92-93 (reviewing those issues as questions of law). On that issue, the trial court reasoned that the appeals were "unduly lengthy" due, in part, to the state's failure to prioritize its first appeal. It is true that the state could have pursued the first appeal with greater diligence; however, the state's attorney moved for only two 28-day extensions of time in which to file the opening brief in part because of the other cases for which she was responsible. We cannot say that the state took an unreasonably long time to brief the case or contributed unduly to the delay. Indeed, defense counsel sought more than three months of extensions to file the answering brief and added to the delay with a cross-appeal that defendant ultimately abandoned.[8] To be sure, part of the delay also derived from the state's motion to supplement the record and its motion for a limited remand. The purpose of those motions, however, was to speed up the process, not slow it down.

With regard to the second appeal, the parties pursued it with exemplary diligence. The state moved for one seven-day extension of time in which to file its opening brief, and defendant did not ask for any extensions of time. We do not discount the length of time that the appellate process took; however, we cannot say that the state took an unreasonable amount of time or acted in a dilatory manner.

We also disagree with the trial court's implicit conclusion that the state acted unreasonably in pursuing the two appeals. The second appeal presented unresolved issues of state law, and its outcome was far from a foregone conclusion. *See Johnson II*, 335 Or at 520 (explaining that the allocation of burdens of production and persuasion presented an unresolved issue of state law). If the trial court had erred in

evidence until July 1999. Additionally, defendant agreed to more than one year's worth of delayed trial. The rest of the time outside of those appeals consisted primarily of setting new trial dates and of hearings on various motions.

[8] Defendant filed his answering brief on October 32, 2000, five days after he filed his second request for a 42-day extension. On December 7, 2000, approximately five weeks later, he filed a motion to dismiss his cross-appeal, which the Court of Appeals dismissed 12 days later.

placing the burden of persuasion on the state, then the factual finding on which its order depended would have had no force. We also conclude that the state acted reasonably in pursuing its first appeal. Not only had the trial court based its ruling on a statute that had been superseded, but the appeal presented a novel issue of state law—how the inevitable discovery doctrine applies to unlawful seizures as opposed to unlawful searches. *Johnson I*, 177 Or App at 248-50. The fact that the state did not prevail on the two appeals does not mean that it acted unreasonably in pursuing them.

In sum, looking at the length of the delay and the two appeals responsible for most of it, we conclude that the length of the delay weighs against the state but that the state did not act unreasonably in taking or pursuing the two appeals. *See Haynes*, 290 Or at 86-87, 90-91 (rejecting speedy trial claim in case involving two pretrial appeals); *cf. Tiner*, 340 Or at 556-57 (concluding that little justification existed for delay caused by an unwarranted appeal); *Harberts*, 331 Or at 92, 98 (finding speedy trial violation where state pursued an appeal with little likelihood of success, after much delay already had occurred, and then failed to prioritize that appeal and ultimately abandoned it).

The final factor is prejudice to the defendant. On that point, defendant argues that he suffered prejudice to all three interests protected by the speedy trial requirement in the form of lengthy incarceration, anxiety, and impairment of his defense. With regard to the first interest, the length of the pretrial incarceration in this case cuts against the state. With regard to the second interest, the trial court found, in ruling on defendant's speedy trial motion, that he appeared "in good health without visible stress." Accordingly, the second interest does not advance defendant's speedy trial claim. *See State v. Dykast*, 300 Or 368, 378, 712 P2d 79 (1985) (reaching similar conclusion under comparable facts).

With regard to the third interest, defendant contends that, by the time of trial, several witnesses had forgotten critical facts and that their lost memories hampered his defense in two respects.[9] Defendant's claims of trial prejudice arise

---

[9] Defendant does not raise on appeal two arguments that he made to the trial court regarding how the delay impeded his ability to prepare a defense: first, defendant does not rely on the loss of certain physical evidence (cigarette butts and a

from a related series of events. We first set out the trial testimony regarding those events. We then turn to the specific details that some of the witnesses could not remember and explain why we conclude that, considering the other evidence on the same points, the witnesses' inability to remember did not prejudice defendant.

At trial, Stacy Satter and Donald Blocker testified regarding defendant's attempts to trade jewelry and other valuables for methamphetamine shortly after the victim's death. Satter testified that, when she met defendant in a park, he had a backpack containing jewelry and a Citizens Band radio that he was trying to trade for drugs. Defendant initially had asked Blocker to make the trade. According to Satter, Blocker took the jewelry but not the radio to see if he could trade it for drugs. When Blocker's efforts proved unsuccessful, Satter took the jewelry and was able to trade it for a small amount of methamphetamine, which she brought back to defendant and Blocker.

Blocker testified consistently with Satter. He did not remember seeing a radio but testified that he had attempted to trade the jewelry unsuccessfully. He also testified that, in talking with defendant about where he had gotten the jewelry, defendant "said he offed the bitch for what he had"—*i.e.*, for the jewelry that he was trying to trade for drugs. Blocker testified, as Satter had, that she took the jewelry and was able to trade it for a small amount of methamphetamine, which he and defendant consumed.

Two other witnesses, Vicki Free and Earl Jones, testified regarding different encounters with defendant. While defendant was visiting Free's home shortly after the murder, he gave her two pairs of earrings, which were similar to earrings that the victim had owned. Jones was Free's fiancé. He was not present when defendant gave Free the earrings. However, Jones testified that he saw defendant later that same day. He noticed that defendant had some rings, an Elgin watch, and cell phones that he was trying to trade for

---

throw-down); second, defendant does not rely on the death of the victim's landlord, who first reported finding the victim's body. Accordingly, we do not address those arguments. Moreover, as the state notes, defendant did not raise before the trial court an argument that he makes here for the first time regarding certain evidence that the state introduced during the penalty phase of the trial. Because that argument is unpreserved, we decline to address it.

drugs. Jones testified that Free had not been present and had not seen the watch but that he may have told her about it.

Defendant contends that, by the time of trial, Blocker and Free had forgotten critical details about those incidents that could have aided his defense. He notes that Free could not remember whether she had told the police that he had a watch and Blocker could not remember whether defendant had a Citizens Band radio that he was trying to trade for drugs. Defendant argues that, if Free and Blocker had remembered that he possessed that property in addition to the jewelry, the jury could have inferred that he trafficked generally in stolen property and that he had received the victim's jewelry in the course of that enterprise rather than as a result of killing her and stealing the property from her.

The initial difficulty with defendant's argument is factual. For example, he notes that, although Free testified that he had given her earrings shortly after the murder, she testified that she had not seen defendant with a watch and could not remember whether she had told the police that defendant had a watch that day. Even though Free did not remember telling the police that defendant had a watch, Jones told the jury that he had seen defendant with an Elgin watch, and his testimony provided the jury with the information that Free could not remember.[10] Similarly, although defendant argues that Blocker could not remember whether defendant had a Citizens Band radio the day that he was trying to get Satter and Blocker to trade the jewelry for drugs, Satter remembered that he had a radio.

Even if some witnesses suffered a loss of memory, other witnesses testified to the same facts that defendant argues the jury should have heard. That evidence permitted defendant to argue that he came into possession of the victim's jewelry as a result of trafficking in stolen property generally and not as a result of killing the victim. Beyond that,

---

[10] Defendant makes too much of Free's inability to remember in another respect. Although Free testified that she had not seen defendant with a watch and could not remember whether she had told the police that he had a watch, Jones explained that Free had not seen the watch and that he may have told her about it. If Jones's testimony is accurate, then Free could not have testified at trial whether defendant in fact possessed a watch because she had no personal knowledge of that fact.

the inference that defendant seeks to draw from the fact that he possessed other stolen property for trade—*i.e.*, that he came into possession of the victim's jewelry as a result of trafficking in stolen property—seems somewhat strained in light of defendant's statement to Blocker that he came into possession of the jewelry as a result of "off[ing] the bitch."

Defendant also argues that Blocker's loss of memory barred him from impeaching Blocker's trial testimony. Blocker testified on direct examination that, in explaining the source of the jewelry, defendant had told Blocker that "he offed the bitch for what she had." Blocker acknowledged, on direct examination, that he had made contradictory statements to a defense investigator. Blocker testified that he had told the investigator that defendant had not "said these things" and that the police had threatened to charge him with aggravated murder. Blocker also explained on direct examination why he had made those statements to the investigator.[11]

On cross-examination, defense counsel sought to impeach Blocker's testimony by asking him whether the investigator had asked certain specific questions and whether Blocker had replied either that defendant had denied being involved in the murder or that the detectives had threatened him. Blocker testified that he remembered some of the questions and answers, that he did not remember others, and that he might have made some of the statements but that he could not remember specifically whether he had done so. Defendant argues that Blocker's inability to remember all the specific questions that the investigator had asked and all the answers that he had given prevented defendant from impeaching Blocker's testimony.[12]

---

[11] Blocker testified at trial that he had thought that the investigator was from the state, that he was mad because the investigator had refused to provide him with a lawyer during questioning, and that he had made those statements to the investigator because he was mad at him.

[12] Some of defendant's arguments on this point are simply factually wrong. He asserts, for example, that Blocker could not remember telling the investigator that the police had told Blocker that they had the guy in custody who had committed the murder and wanted to put him away. Blocker, however, testified at trial that he had made that statement to the investigator, that he remembered the question and answer, and that "[t]hat is what I said."

Defendant's second argument suffers from the same factual problem as his first. Blocker testified on direct examination, in substance, to the same points that defendant contends he could not elicit, due to Blocker's loss of memory, on cross-examination. Defendant could have used Blocker's testimony on direct to impeach his testimony that defendant had admitted "off[ing] the bitch." Moreover, defendant told the police that Blocker was not lying when he reported that defendant had said that he had "offed the bitch" to rob her. Because defendant's own statements to the police confirmed that he had made that incriminating statement to Blocker, it is difficult to see how any inability to impeach Blocker's testimony prejudiced defendant.[13]

■ Finally, defendant argues that the delay impeded his ability to prepare a defense because his aunt, who helped raise him and with whom he was close, died during the pendency of this case. Defendant contends that her testimony would have helped him during the penalty phase of the trial. Aside from the fact that defendant failed to preserve that argument, it is speculative. As defendant admits, "[i]t is not possible to know what she might have said [although] it is highly likely that [she] would have had something kind to say." *See Tiner*, 340 Or at 558 (discounting prejudicial effect of loss of speculative testimony). In short, defendant has not shown that the delay caused a reasonable possibility of prejudice to the defense.

In this case, the state pursued with reasonable diligence two pretrial appeals that, although unsuccessful, raised new or novel issues. Moreover, while the appeals process consumed a considerable amount of time, the resulting delay did not cause a reasonable possibility of prejudice to defendant's ability to defend against the charges. We therefore reject defendant's speedy trial claim under Article I, section 10, of the Oregon Constitution.

---

[13] Defendant also notes that Blocker could not remember whether he told Detective Stoelk that defendant had pointed to West Salem, and away from the victim's house, when defendant told Blocker that he had "offed the bitch." Defendant, however, called Stoelk, who testified that Blocker told him that defendant had pointed towards West Salem when defendant made that statement. Stoelk's testimony remedied Blocker's inability to remember which way defendant had pointed.

 Unlike the Oregon Constitution, the speedy trial analysis required by the Sixth Amendment contains an additional factor—when a defendant first raised his or her speedy trial claim—that the court must balance along with the length of the delay, the reasons for the delay, and the prejudice to the defendant. *See Barker v. Wingo*, 407 US 514, 530, 92 S Ct 2182, 33 L Ed 2d 101 (1972) (describing federal four-factor balancing test). Although the failure to assert the speedy trial right does not constitute a waiver of that right, the United States Supreme Court has "emphasize[d] that the failure to assert the right [in a timely manner] will make it difficult for a defendant to prove that he was denied a speedy trial." *Id.* at 528-29. Here, defendant did not make a speedy trial claim until October 2003, more than five years after the indictment. That delay in asserting his speedy trial right cuts against his federal speedy trial claim. Balancing that delay with the other three factors discussed above, we conclude that the state did not violate defendant's Sixth Amendment right to a speedy trial.

Having resolved defendant's constitutional speedy trial claims, we turn to his statutory claim. ORS 135.747 provides:

> "If a defendant charged with a crime, whose trial has not been postponed upon the application of the defendant or by the consent of the defendant, is not brought to trial within a reasonable period of time, the court shall order the accusatory instrument to be dismissed."

However, even when the state has not brought a defendant to trial within a reasonable period of time, ORS 135.750 provides that the trial court may continue the case if "sufficient reason therefor is shown."

 A statutory speedy trial claim presents two related but separate inquiries. The first question is whether the delay is "reasonable." In deciding that question, a court considers both the length of the delay and the reasons for it. *State v. Johnson*, 339 Or 69, 88, 116 P3d 879 (2005).[14] When

---

[14] In calculating the length of the delay, the court does not count those delays that the defendant causes or to which the defendant expressly consents. *Johnson*, 339 Or at 94-95; *see also State v. Davids*, 339 Or 96, 100-01, 116 P3d 894 (2005)

the length of the delay "is greater than would be expected," a court must examine all the attendant circumstances to determine whether there was good reason for the delay. *Id.* at 88-89. A defendant need not show prejudice to prove that the state failed to bring him to trial within a reasonable period of time. *Emery*, 318 Or at 470.

■■ If the state has failed to bring a defendant to trial within a reasonable period of time, then the remaining question is whether there is "sufficient reason" to continue the case. ORS 135.750. In deciding the sufficiency of the reason, this court has looked to the purposes for enacting the speedy trial statute—to clear out cases that "are languishing in the criminal justice system" and to serve as a "housecleaning" mechanism for trial court dockets. *Johnson*, 339 Or at 90-91. The question whether the delay is reasonable and the question whether there is sufficient reason to continue the case present questions of law. *Id.* at 86-87.

■ In this case, defendant acknowledges that he consented to nearly a year's worth of delay by agreeing to later trial dates. Moreover, defendant consented to further delay by obtaining extensions of time to file briefs on appeal and by filing a cross-appeal that he ultimately abandoned.[15] Nonetheless, the remaining delay of more than four years is enough to trigger an inquiry into its reasonableness.

■■ As noted, the trial court questioned the reasonableness of both the state's decision to take the two appeals and also the diligence with which it prosecuted them. Although we are bound by the trial court's findings of historical fact, the determination whether any delay was reasonable presents a question of law for this court. *Johnson*, 339 Or at 86-87. As we explained in the course of deciding defendant's state constitutional speedy trial claim, we cannot say that the state lacked a sufficient justification for taking the two

(assuming that a defendant's "pattern of tactics at odds with demanding dismissal" under ORS 135.747 might constitute an implied waiver of the right to a speedy trial).

[15] The trial court denied defendant's speedy trial motions, which were based on statutory and constitutional grounds. Although the trial court did not address defendant's statutory speedy trial claim explicitly, we assume that its explicit and implicit findings of fact regarding the constitutional speedy trial claims apply equally to the statutory claim.

appeals or that it took an unreasonable time to brief the issues that the two appeals raised.

We also note that defendant's statutory speedy trial claim entails an issue that his constitutional speedy trial claims did not. The legislature specifically has authorized the state to take pretrial appeals from, among other things, adverse rulings on suppression motions. *See* ORS 138.060(1)(c). Although that legislative decision does not affect the decision whether the state has honored a defendant's constitutional right to a speedy trial, it does bear on the statutory questions whether the state has brought a defendant to trial within a reasonable period of time and, if not, whether there is a sufficient reason to continue a case. To hold otherwise would effectively prevent the state from reasonably pursuing a procedure that the legislature specifically has authorized. It follows that, when, as in this case, the state reasonably has made a decision to take two pretrial appeals and has prosecuted those appeals with reasonable diligence, either the resulting period of time is reasonable under ORS 135.747 or a sufficient reason exists for continuing the case under ORS 135.750. The trial court did not err in denying defendant's statutory speedy trial claim.

Defendant finally assigns error to the trial court's ruling regarding his use of expert testimony. The court ruled that introducing expert testimony regarding footprints found at the victim's home would open the door to evidence regarding defendant's boots that the trial court had suppressed. The ruling that defendant challenges has a lengthy history. We first summarize that history and then set out the ruling to which defendant assigns error before turning to defendant's arguments.

As noted, the trial court issued two pretrial orders suppressing defendant's clothing and boots because the state unlawfully had seized them. The state had tested defendant's boots after seizing them, and the suppression orders precluded the state from putting on expert testimony that defendant's boots were consistent with a footprint left in blood at the crime scene.[16] Although the state recognized that it could

---

[16] During the pretrial hearing, defense counsel described the state's expert report as stating that the defendant's boots were consistent generally with the

not offer that evidence, it noted at a pretrial hearing that Detective Stoelk had observed the soles of defendant's boots before seizing them. Stoelk had noticed that the pattern on defendant's soles was consistent with a footprint found at the victim's home. The state contended that Stoelk could offer that testimony, which the state had obtained independently of any illegality.

Defense counsel responded that, if the state offered Stoelk's testimony, they intended to introduce expert testimony to establish that visual observations were not a reliable way to identify the source of the bloody footprint. Rather, scientific testing was required. The state replied that introducing that evidence would imply inaccurately that it had not done any scientific testing when, in fact, it had done so. The state contended that, if defendant sought to introduce that evidence, he would open the door to the evidence that the trial court had ordered suppressed.

Faced with those arguments, the trial court concluded that the better course was to preclude the state from making any reference to Stoelk's observations of defendant's boots. It reasoned that the potential prejudice (the inaccurate inference raised by defendant's rebuttal evidence) outweighed the probative value of the state's evidence.[17] The state accordingly presented its case-in-chief without making any reference to Stoelk's observations of defendant's boots.

After the state had presented its case-in-chief, defense counsel made an offer of proof in which they took a different position. As the initial part of an offer of proof, they observed that there were two distinct sets of footprints in the victim's house. One set of footprints was consistent with the pattern that Stoelk had noticed on the soles of defendant's boots. There also was a second, different set of footprints on a broken knife blade, on some papers lying near the victim's

footprint left at the crime scene. He noted that the report did not identify any unique markings on the sole that would permit the expert to opine that defendant's boots in fact had left the footprint.

[17] We describe the trial court's initial ruling to put its later rulings in context. We do not endorse it. *Cf. State v. Hart*, 309 Or 646, 652, 791 P2d 125 (1990) (holding that a trial court may not preclude the state from offering admissible evidence because the defendant's anticipated response would open the door to otherwise inadmissible evidence).

body, and in the mud outside the victim's home. Defense counsel reasoned that the second set of footprints was more immediately connected with the victim's death than the first.

Defense counsel explained that they wanted to introduce a pair of defendant's tennis shoes to show that his tennis shoes did not match the second set of footprints. Defense counsel also wanted to call Detective Stoelk to testify to evidence that the defense successfully had objected to earlier, that is, they wanted to call Stoelk to testify that the boots that defendant had been wearing when the officers arrested him were consistent with the first set of footprints found at the crime scene.

The court and the parties discussed the issue off the record, at which point defense counsel explained that they also intended to introduce expert testimony to show that there were two sets of footprints in the victim's house. The trial court announced a tentative ruling, which it later put on the record. The court observed that, by introducing evidence relating to defendant's boots, defendant ran the risk of opening the door to the evidence that the court previously had suppressed, and it sought to identify how far defendant could go without opening the door. The court stated that defendant could introduce "lay evidence" that two different sets of footprints were found at the scene of the crime. It also recognized that defendant could call Stoelk to testify that defendant had been wearing boots that were consistent with one set of footprints. It reasoned that the introduction of that evidence would not "ope[n] the door to the entire suppressed evidence or the comparison made by the Oregon State Crime Lab of the defendant's boots with the latent[ footprints] left at the s[cene]."

The trial court explained that it was concerned that, if the defense went further and introduced expert testimony regarding the footprints, the jury would draw the incorrect inference that the state had failed to make comparable scientific tests of defendant's boots. The court observed that the only issue on which defendant apparently wanted to introduce expert testimony—that there were two sets of footprints in the victim's house—did not require an expert. Rather, the

court explained that it was apparent from the photographs that there were two different sets of prints.

Later, defendant completed his offer of proof. The offer of proof revealed that the expert would testify that there were two distinct sets of footprints at the crime scene. The first had been made by a shoe with a lug type sole; the second had been made by a shoe with an oval and bar pattern on the sole. The expert would testify that the second pattern was visible on the knife blade, on a spot of blood near the knife blade, on papers surrounding the victim's body, and in the mud outside of the victim's house. In each instance, the oval and bar pattern was the same. In the expert's opinion, the more complete footprint in the mud made clear what was "fairly convincing" from the other prints alone—that the oval and bar pattern had been made by a shoe.

After hearing the completed offer of proof, the court asked defendant to specify what the expert testimony added to a lay person's observation of the two distinct sets of footprints. In answering that question, defendant did not argue that a lay person could not determine that there were two separate sets of footprints, nor did he contend that it would not be apparent to a lay person that the oval and bar pattern appeared on the knife blade and in the mud. Rather, he argued that, without expert testimony, a juror could not conclude that the pattern on the spot of blood was similar to the pattern on the knife blade. He also argued that, without expert testimony, a juror could not "necessarily conclude" that the pattern on the documents was the same as the pattern on the knife blade.

The court, in turn, asked the state why introducing expert, as opposed to lay, testimony would be prejudicial. The state explained that, if defendant's witness testified as an expert, the jury would be aware that the expert had made a series of measured and scaled comparisons between the footprints. The jury also would know, given defendant's offer of proof, that the police had noticed the soles of defendant's boots when they arrested him and that the soles of his boots appeared to match one set of footprints at the crime scene. The state argued that the jury incorrectly would infer from that limited evidence that the police had failed to make any

further examination of defendant's boots or undertake any scientific tests to determine whether they matched the footprints at the scene of the crime.

After considering the parties' arguments, the trial court ruled:

> "I believe, once again, we get into what will be improper inferences for the jury to draw if we get into expert testimony, particularly because it is true that those same kind of measurements were done [by the state] with regard to defendant's boots. And if we get scientific, the [jury is] going to understand that that's something that gets done and that in fact should have been done in this case, and they're going to conclude that it wasn't. And so I think we're on a safe path if we only have lay testimony with regard to the observations of the latent[ footprints found at the crime scene] and observations of any footwear. And as long as the cross-examination of various witnesses is only lay testimony, then I think that we're still on safe ground."

The court's ruling did not preclude defendant from offering his expert's testimony. However, if defendant chose to offer expert testimony, he would open the door to the state's expert testimony that defendant's boots were generally consistent with the first set of prints found at the crime scene.

Defendant chose not to offer expert testimony and open the door to the tests that the state had done on his boots. Rather, he offered lay and photographic evidence to prove that there were two sets of footprints and to show that one set of footprints was found on the knife blade, on the papers surrounding the body, and in the mud. Defense counsel also called Stoelk to show that defendant had been wearing boots that were consistent with the other set of shoe prints. Defense counsel asked Stoelk whether he had seen a "partial shoe impression etched in blood" made by a "full-sized shoe having a heavy, cleated lug sole type design on the shoe sole" at the crime scene. When Stoelk said that he had seen such a shoe impression, defense counsel then asked Stoelk whether the soles of the work boots that defendant had been wearing "appeared to be similar to the heavy, cleated lug type work boot impressions which you observed at the crime scene." Stoelk testified that they were.

In closing, defendant argued those same points, and the state did not dispute them. Rather, the state agreed that there were two sets of footprints at the scene of the crime and that only one of them was consistent with defendant's boots. The state disagreed with the inferences to be drawn from those facts—*i.e.*, whether defendant or someone else was personally and intentionally responsible for murdering the victim. But the state did not disagree with the underlying facts regarding the two sets of footprints on which defendant based his argument.

On review, defendant argues that the trial court erred in ruling that, if he offered expert testimony regarding the footprints found at the crime scene, he would open the door to suppressed evidence regarding defendant's boots. As an initial matter, we note that defendant's offer of proof consisted of more than the expert's testimony. It also consisted of defendant's statement that he intended to introduce his tennis shoes to show that they did not match the oval and bar pattern on the second set of footprints[18] and that he intended to introduce evidence that the detectives noticed that the soles of the boots that he was wearing when they arrested him were consistent with first set of the footprints found at the crime scene.

Defendant does not dispute that a party may open the door to evidence that has been suppressed. As this court recognized in *State v. Miranda*, 309 Or 121, 128-29, 786 P2d 155 (1990), a defendant who selectively testifies regarding some of his suppressed statements and thus implies that he had "come clean" with the police runs the risk that the state may inquire about the remainder of his statements on cross-examination. Defendant argues, however, that the evidence that he sought to offer in this case was not sufficient to open the door to the evidence that the trial court had suppressed.

We think that the trial court's ruling in this case is consistent with the holding in *Miranda*. Defendant wanted to present expert testimony regarding the two sets of footprints;

---

[18] In his offer of proof, defendant did not explain whether he would introduce expert testimony to show that his tennis shoes did not match the second set of footprints or whether he thought that the jury could make that determination without expert assistance.

he also wanted to introduce evidence that the soles of his tennis shoes did not match one set of footprints found at the crime scene and that an officer had noted that his boots were consistent with another set of footprints found there. The trial court correctly recognized that, given only that evidence, the jury would infer (correctly) that expert testimony was necessary in this area and (incorrectly) that the state had failed to test critical evidence. The inference was particularly problematic because one of the defense theories was that the state had failed to test and preserve critical DNA evidence. The partial presentation of evidence regarding his boots that defendant sought to introduce bled all too easily into the same theme—that the state had failed to test defendant's boots even though the officers were aware that they could be linked to the murder.

██ Moreover, as the trial court also recognized, any prejudice resulting from the use of lay rather than expert testimony in this somewhat unique situation appears slight, if nonexistent. Defendant was able to make essentially the same factual points, which the state did not dispute, through lay testimony and photographic evidence. On these facts, we cannot say that the trial court erred in offering defendant the option to use lay testimony and avoid opening the door to the introduction of the suppressed evidence.[19] Having considered all of defendant's arguments, we uphold the conviction of aggravated murder and the sentence of death.

The judgment of conviction and sentence of death are affirmed.

---

[19] We note that the downside of opening the door to the state expert's testimony, which defendant sought to avoid, does not appear significant in this case. Defendant offered evidence that his own boots appeared to match one set of "shoe impression[s] etched in blood" at the crime scene. For all that appears from the record, defendant sought to avoid opening the door to expert testimony that he owned shoes that were generally consistent with one set of bloody footprints found at the crime scene. We fail to see a difference of any substance between the evidence that defendant offered and the evidence that he sought to avoid.