Argued and submitted December 20, 2007, affirmed August 13, 2008

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SHEILA DUBOIS,
*Defendant-Appellant.*

Klamath County Circuit Court
0300061CR; A127939

191 P3d 670

David Ferry, Deputy Public Defender, argued the cause for appellant. With him on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

David B. Thompson, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Sercombe, Judge, and Riggs, Senior Judge.

SERCOMBE, J.

**SERCOMBE, J.**

Defendant appeals a judgment of conviction for unauthorized use of a vehicle, ORS 164.135, and criminal conspiracy, ORS 161.450. On appeal, defendant asserts five assignments of error, the first three of which pertain to her convictions; her fourth and fifth assignments of error challenge the trial court's award of restitution. We affirm.

## I. BACKGROUND

Because defendant was convicted by a jury, we state the facts in the light most favorable to the state. *State v. Johnson*, 342 Or 596, 598, 157 P3d 198 (2007), *cert den*, 128 S Ct 906 (2008). At the center of this case is a 1975 Chevy Camaro. In early 2001, the car was registered to defendant but was being driven by her husband, Dubois. In May 2001, defendant discovered that Dubois was having an affair with her friend, Howe. Defendant obtained a restraining order against Dubois that prevented him from going near defendant and her property, including the Camaro. On May 15, 2001, after an altercation with defendant, Dubois drove the Camaro to Howe's address. The following day, Dubois was arrested, but the Camaro disappeared. Defendant reported to police that the car had been stolen.

On July 25, 2001, Dubois and Howe took the car to the Department of Transportation, Driver and Motor Vehicle Services Division (DMV), and attempted to register the Camaro in Howe's name. They presented a title to the Camaro that contained defendant's signature releasing her interest in it. Nonetheless, because the car had been previously reported stolen, DMV notified the police department and delayed transferring title to Howe pending the investigation.

As part of the investigation, a police officer contacted defendant about the Camaro. Defendant denied that she had ever signed a document transferring title to the car. Rather, defendant told the officer that her signature was forged. The police officer concluded that the dispute over ownership of the car was essentially civil in nature and was best resolved through civil rather than criminal proceedings.

In the meantime, Dubois was sentenced to prison for charges stemming from his earlier arrest, and he left the car with Howe. Dubois and Howe then corresponded from prison regarding the fate of the Camaro. Howe suggested that the Camaro be given to her mother, O'Neal, to whom Dubois and Howe owed rent. Dubois, however, sought the assistance of his friend Zanotto, and asked her to take his belongings, including the Camaro, to his own mother's home instead.

Howe did not approve of the plan to drive the Camaro to Dubois's mother's house, and she refused to cooperate with Zanotto. At that point, Zanotto went to DMV and determined that defendant was the registered owner of the vehicle because the title transfer processing had been delayed by defendant's earlier report that the car was stolen. Zanotto then contacted defendant, and the two of them agreed to retrieve the car from Howe based on the fact that it was registered in defendant's name. Defendant and Zanotto then went to the police station and persuaded the police to assist them in retrieving the Camaro, based on defendant's representation that she was the registered owner of the car.

Zanotto and defendant drove to Howe's property on October 31, 2001, to take possession of the Camaro; they were accompanied by a police officer. When they arrived at Howe's property, Zanotto and the officer approached Howe. Defendant remained at the edge of the property because, by all accounts, she was not welcome on Howe's property. In fact, according to defendant, Howe had previously "sicced her Rottweilers on" defendant.

When Zanotto told Howe that she was taking the Camaro, Howe and O'Neal, who was also present, both "threw a fit in the driveway," including "screaming and throwing papers around[.]" The officer then proposed that the car be stored at Zanotto's house while the issue of ownership was resolved; Zanotto represented to Howe that she would not charge a fee for the storage. Believing that she had no choice in the matter, Howe allowed Zanotto to drive the Camaro to her house for storage, pending the resolution of defendant's claim of ownership.

From her vantage point, defendant did not hear the conversation that occurred between Zanotto, Howe, and the

officer, but she watched Zanotto drive the Camaro off of Howe's property. Defendant then left in Zanotto's car. Once they had driven a few blocks away from Howe's property, defendant and Zanotto switched cars, and defendant drove the Camaro to Zanotto's house. The unauthorized use of a vehicle charge against defendant is based on that use of the Camaro.

Sometime thereafter—and despite her assurance to Howe that there would be no fee for holding the Camaro—Zanotto entered into an agreement with defendant to store the car for $75 per month. The November 3, 2001, written agreement made specific reference to the possibility of a lien on the Camaro: "If for any reason payments are not made we also agree that a lien for storage fees will be filed on vehicle and all fees must be paid in full."

While the car was being held at Zanotto's, a handwriting analysis on the Camaro's title was completed. It revealed that defendant had, in fact, signed the title, thereby releasing her interest in the car; defendant ultimately admitted as much to one of the investigating officers.[1] At that point, the police informed Howe that the ownership issue had been resolved and that she could retrieve the Camaro from Zanotto's storage. Howe and O'Neal, sometimes accompanied by police, repeatedly attempted to recover the Camaro, but Zanotto consistently made excuses as to why she could not produce the car. Finally, in March 2002, threatened with arrest if she continued to stall, Zanotto turned over the Camaro to Howe.

That, however, was not the end of the road for the Camaro. After recovering the Camaro, Howe gave the car to O'Neal as payment for rent owed, and the car was taken to O'Neal's house. On May 10, 2002, O'Neal discovered that the car was missing and reported it as stolen. After making the report, O'Neal discovered that Zanotto had placed a storage lien on the Camaro—based on unpaid bills that were provided to defendant pursuant to the "storage agreement"—and had followed the statutory process to foreclose on the lien and acquire title to the Camaro. The police then investigated

---

[1] At trial, however, defendant once again denied that it was her signature.

Zanotto's actions in connection with the lien, but O'Neal never recovered the Camaro after it disappeared from her carport.[2]

Eventually, defendant and Zanotto were charged with crimes arising out of their involvement with the Camaro. Defendant, for her part, was charged with one count of unauthorized use of a vehicle (UUV), ORS 164.135, and one count of conspiracy to commit theft, ORS 164.055; ORS 161.450. Zanotto was charged with two counts of UUV (one involving her use of the Camaro in October 2001 and the other involving her use of the car in May 2002); conspiracy to commit theft; first-degree theft, ORS 164.055; and false swearing, ORS 162.075. Defendant and Zanotto were tried together, and the jury returned guilty verdicts on all counts.[3]

## II.  ANALYSIS

A.  *First Assignment of Error*

■  In her first assignment of error, defendant argues that the trial court erred in denying her motion for a judgment of acquittal on the count of unauthorized use of a vehicle. That count alleged that "defendant on or about the 31st day of October, 2001, in Klamath County, Oregon, did unlawfully and knowingly take a vehicle, to-wit: a 1975 Chevrolet Camaro * * * without the consent of the owner, [Howe] and/ or [O'Neal] * * *." *See* ORS 164.135(1)(a) (A person commits the crime of unauthorized use of a vehicle when "[t]he person takes, operates, exercises control over, rides in or otherwise uses another's vehicle, boat or aircraft without consent of the owner[.]").

At the close of the state's case, Zanotto, who also had been charged with the same count of unauthorized use of a vehicle, moved for a judgment of acquittal. Zanotto argued that her own use of the vehicle was, in fact, with the consent

___

[2] At the time that the Camaro went missing in May 2002, Howe had not formally transferred title to O'Neal. Ironically, in December 2002, after the Camaro was missing, O'Neal used the statutory lien foreclosure process against Zanotto and Howe to obtain title to the car—the same process by which she lost the Camaro to Zanotto.

[3] Zanotto appealed separately, and this court affirmed without opinion. *State v. Zanotto*, 217 Or App 411, 174 P3d 1133 (2007).

of the owner because (1) as of October 31, 2001, *defendant*—not Howe or O'Neal was the registered owner of the car, and (2) a police officer directed Zanotto to take custody of the vehicle at that time. Defendant then joined in that motion, arguing that, "by [Howe] and/or [O'Neal] allowing it to be moved and stored, it is not an unauthorized use regardless of whether the police officer said they could use it." In short, defendant argued that Howe had consented to the storage of the Camaro and that the fact that the consent was obtained through deception was irrelevant.

On appeal, defendant renews her argument that the evidence was insufficient to establish that defendant drove the Camaro on October 31 "without consent of the owner," an element of the crime of UUV.[4] According to defendant, on this record, there was only one inference available to the jury: that defendant had no way of knowing that the victim did not consent to her use of the Camaro. "On the contrary," defendant argues, "everything in the record would have indicated to anyone in defendant's position that the victim had assented to the moving of the car as the agreed-upon course of conduct pending the outcome of the dispute."

The problem with defendant's argument, as the state correctly points out, is that it ignores the competing inferences that were available on this record regarding the scope of Howe's assent and defendant's mental state. *See State v. Krummacher*, 269 Or 125, 138, 523 P2d 1009 (1974) (in reviewing a motion for a judgment of acquittal, the court determines "whether the inferences that may be drawn from [the disputed and undisputed facts] are sufficient to allow the jury to find defendant's guilt beyond a reasonable doubt"). That is, even assuming that Howe assented to *Zanotto* moving and storing the car, such assent does not, as a matter of law, extend to *defendant's use of the car.*

---

[4] Defendant also argues that the evidence is insufficient to establish that defendant—as opposed to Zanotto—"took" the vehicle from Howe on October 31, 2001. It is not apparent from defendant's brief, nor from our review of the portions of the transcript concerning the motion for a judgment of acquittal, that defendant raised that issue in any respect in the trial court. Accordingly, we do not address it on appeal.

Viewed in the light most favorable to the state, the evidence at trial established that: (1) defendant knew that Howe was the rightful owner of the Camaro on October 31, 2001; (2) the relationship between Howe and defendant was so poor that defendant was not even allowed on Howe's property at that time; (3) Howe believed that she, and not defendant, was the owner of the Camaro and refused to acknowledge defendant's rights to the Camaro; (4) Howe allowed Zanotto to drive the Camaro to her house for storage only after being directed to do so by the police officer; and (5) defendant drove Zanotto's car away from Howe's property and did not drive the Camaro until they were a few blocks away from Howe.

From those facts, the jury reasonably could have inferred that defendant knew, as of the time that she arrived at Howe's property, that she was not authorized to drive Howe's Camaro; that she knew that Howe consented to *Zanotto* driving the Camaro for the limited purpose of storing it at Zanotto's house while the ownership issue was resolved; that, given the history between Howe and defendant (including the Rottweilers incident and competition for the affection of Dubois), defendant knew that Howe most likely would not have consented to *defendant* driving the Camaro for *any* purpose; and that defendant and Zanotto created the impression in Howe's mind that Zanotto—not defendant—would be driving the Camaro, and switched cars only when out of Howe's sight.

Under those circumstances, the fact that Howe allowed Zanotto to drive the Camaro does not mean, as a matter of law, that defendant also had consent to drive the vehicle or reasonably believed that she had such consent. Rather, Howe's intent in that regard and defendant's state of mind at the time she drove the Camaro were matters for the jury to decide. And, on this record, the jury reasonably could have found, based on the facts and reasonable inferences available from those facts, that defendant knowingly drove the Camaro on October 31, 2001, without Howe's consent.

Defendant also renews her argument that, because the Camaro was still registered in her name on October 31, 2001, she was the "owner" of the car and therefore could not

have driven the car without the consent of the owner. "Ownership" of a vehicle, for purposes of the crime of UUV, however, is not determined solely based on DMV registration records. Although those records may constitute *prima facie* evidence of ownership, *see, e.g., State v. Dollar*, 181 Or App 354, 358, 45 P3d 1014 (2002), the state presented ample evidence from which the jury could have found that defendant intended to transfer ownership of the Camaro prior to October 31, 2001, and that she knew that her subsequent claim of ownership was both fraudulent and illegitimate.

In sum, because the evidence at trial would have permitted the jury to find that defendant drove the Camaro without the owner's consent on October 31, 2001, the trial court did not err in denying defendant's motion for a judgment of acquittal on the charge of unauthorized use of a vehicle.[5]

## B. *Second Assignment of Error*

◼ In her second assignment of error, defendant argues that the trial court erred in denying her motion for a judgment of acquittal on the charge of conspiracy to commit theft. Defendant argues that "the evidence is insufficient to establish the required meeting of the minds, [and] defendant's motion for judgment of acquittal should have been granted." More specifically, defendant acknowledges that the state presented evidence that defendant and Zanotto agreed to take the car away from the victim but argues that "that agreement alone cannot establish a criminal conspiracy unless the state established that defendant and codefendant understood and agreed that the taking of the car would be a crime." In response, the state contends that the "meeting of the minds"

---

[5] Defendant also argues, based on the consent that was given to Zanotto, that Zanotto was a lawful bailee of the Camaro and that "defendant had every reason to assume that [Zanotto] had authority to provide defendant the consent to drive the vehicle within the scope of the bailment." Apart from the fact that defendant did not make that argument below, and assuming for the sake of argument that Zanotto was a lawful bailee, defendant's argument founders on the factual premise that defendant "had every reason to believe" that Zanotto had authority to consent to defendant driving the vehicle. As discussed above, there are competing factual inferences regarding the scope of any alleged bailment—one of which is that Howe's consent (or "bailment") did not extend to defendant's use of the vehicle.

issue is raised for the first time on appeal and is therefore not preserved for our review. We agree with the state.

As was the case with the UUV charge, Zanotto was charged with the same count of conspiracy to commit theft as defendant and made a motion for a judgment of acquittal on that count. In support of that motion, Zanotto argued that "the title to the vehicle, the registered title to the vehicle at the time as alleged in the criminal conspiracy count was [defendant's;] therefore, the state has failed in its proof." Defendant then joined in that motion and argued, additionally, that, although the state was emphasizing defendant's "unclean hands," the state "hasn't even charged theft by deception. Theft by deception is a completely different issue than theft by taking." Defendant continued:

> "[A]s far as the criminal conspiracy, it is theft by taking. And the only theft alleged in the entire complaint is on May 10, 2002. There is no other theft charged in 2001 so how are we going to have a conspiracy to commit a theft when there is no theft charge to either party, either defendant. * * * The pleading is not there to get where [the state] wants to be."

Thus, neither Zanotto nor defendant argued below, as defendant does on appeal, that the state "failed to establish that *both* of the parties to the 'conspiracy' were operating under a belief that they were committing a crime at any given time during the relevant period[.]" (Emphasis defendant's.) Rather, they argued (1) that the state's proof concerned theft by deception but the indictment alleged theft by taking and (2) that no theft by taking had been committed in the fall of 2001, because defendant was the registered owner of the Camaro. In sum, defendant's argument below did not alert the trial court to the proof issue regarding the "meeting of the minds" that defendant now raises on appeal, and we decline to address the second assignment of error for that reason. *See State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) ("[A] party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted."); *see also State v. Paragon*, 195 Or App 265, 268, 97 P3d 691 (2004) ("A motion for judgment of acquittal does

not automatically encompass a challenge to the sufficiency of the evidence. The motion must state the specific theory on which the state's proof was insufficient.").

## C. *Third Assignment of Error*

■     In her third assignment or error, defendant contends that "[t]he trial court erred in denying [her] motion to require the state to elect its theory on [the conspiracy charge]." Defendant made her "motion to require the state to elect" during the course of her own testimony. Defendant's counsel had, in framing a question to defendant, stated that she was "charged with criminal conspiracy for intentionally acting in a manner agreeing with, I guess [Zanotto], to steal the vehicle, I guess, on October 31, 2001." The prosecutor objected, on the ground that defendant's counsel was "improperly forming the charge. There is no October 31st in [the conspiracy count]. That is not a date that has been specified." The prosecutor then explained:

> "[T]here was an agreement in the fall of 2001 that this car was going to be taken. Whether it was the bogus lien that was put together or the agreement that the Defendant just spoke of about, let's go get the car. They agreed. There was a moment there when they agreed."

Defendant, in response, "move[d] the Court to have the State elect which theory they are moving on so that we can address its theory." The court denied the motion.

On appeal, defendant argues that, by denying her motion, the trial court created a jury concurrence problem. In effect, defendant argues that the trial court either should have required the state to elect or instructed the jury that, in order to convict defendant of conspiracy to commit theft, 10 of its members must agree on the same theory of conspiracy—the competing theories being (1) that defendant and Zanotto agreed to take the car from Howe on October 31, 2001, based on the fraudulent premise that defendant was the owner; or (2) that they agreed to take the car from Howe by foreclosing on a phony lien. In defendant's view, her motion to require the state to elect was adequate to alert the trial court to the jury concurrence issue and therefore preserved that issue for appeal; alternatively, defendant argues that the trial court's

failure to instruct the jury on the concurrence issue constitutes error apparent on the face of the record.

In response, the state contends that "the nub of [defendant's] argument is that the trial court committed plain error in failing to instruct the jury that, before it could convict defendant of conspiracy, it had to agree on at least one of the foregoing factual theories for when the alleged agreement occurred." The state proceeds to argue only that any error in failing to so instruct the jury is not apparent on the face of the record.

Initially, we conclude that defendant preserved only the issue whether the trial court erred in denying her motion to require the state to elect. At the time that defendant made the motion, the state had adduced evidence that supported both of the state's theories as to what defendant and Zanotto agreed to do and when they reached that agreement. There is no indication that defendant was prejudiced in her ability to defend against the charges based on the state's refusal to elect, or that the state's two theories were mutually exclusive. Accordingly, nothing prohibited the state from arguing both theories to the jury, and the trial court did not err in denying the motion to require the state to elect a particular theory to support the conspiracy charge. *See State v. Reyes*, 209 Or 595, 622, 308 P2d 182 (1957) (discussing case law to the effect that, "where the evidence discloses, or it appears likely that it will disclose, several crimes, proof of any one of which supports the charge, the court may in its discretion compel an election by the prosecutor of the specific offense, upon proof of which he intends to rely *when it appears that if the application is denied the defendant will be prejudiced or that he will be prevented from properly making his defense*") (emphasis added)).

A motion to require the state to elect is often related to—and, in fact, can obviate—the need for a jury concurrence instruction. *See, e.g., State v. Randolph*, 123 Or App 566, 568, 860 P2d 873 (1993), *rev den*, 318 Or 382 (1994) (state's election of conduct that occurred on a particular date was sufficient to ensure jury concurrence where trial court instructed the jury regarding the election). However, a motion to require the state to elect is often made (as in this case) well before all

of the evidence has come in and well before the trial court considers what jury instructions are appropriate. Moreover, the trial court's ruling on a motion to require the state to elect often involves different considerations from jury concurrence, such as whether the defendant was adequately apprised of the charges and able to mount a defense to those charges. In fact, defendant here couched her motion in terms of her need to "address [the state's] theory" and not in terms of a jury concurrence problem. For those reasons, we conclude that defendant's motion to require the state to elect a theory—a motion made when defendant was attempting to offer testimony in her own defense—was not adequate to preserve any claim of error with respect to the jury instructions that were given later in the case. *See Roop v. Parker Northwest Paving Co.*, 194 Or App 219, 249, 94 P3d 885 (2004), *rev den*, 338 Or 374 (2005) (under ORCP 59 H, error in failing to give a particular jury instruction is not preserved unless the instruction has been requested); ORS 136.330(2) (providing that ORCP 59 H "applies to and regulates exceptions in criminal actions").

■■ We proceed, then, to consider whether to review the claimed instructional error as error apparent on the face of the record, ORAP 5.45(1).[6] An error is apparent on the face of the record for purposes of ORAP 5.45 if (1) the error is one of law, (2) the legal point is obvious, that is, not reasonably in dispute, and (3) to reach the error, "[w]e need not go outside the record or choose between competing inferences to find it[.]" *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990). The question before us in this case is one of law and does not require us to go beyond the record. *See State v. Lotches*, 331 Or 455, 472, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001) (In the context of plain error review for failure to give a jury concurrence instruction, "[t]he first and third elements are not really at issue; the question of what must be included in a

---

[6] Although defendant seems to assign error only to the denial of the motion to elect, it is apparent from the argument in support of that assignment that defendant challenges the trial court's failure to instruct the jury regarding concurrence as error apparent on the face of the record. That, too, is the subject of the state's response to the assignment of error. Accordingly, we elect to review that alleged error as well, despite the fact that it is not the subject of a separate assignment of error. *See* ORAP 5.45(2) (requiring that each assignment of error be separately stated).

jury instruction is a question of law, and what was or was not included is determined readily by examining the instructions that were given. Therefore, the only issue is whether the errors were 'obvious.' "); *accord State v. Hale,* 335 Or 612, 627, 75 P3d 448 (2003), *cert den,* 541 US 942 (2004) (applying that principle and concluding that the failure to give a jury concurrence instruction was error apparent on the face of the record). Accordingly, in light of *Lotches* and *Hale,* the focus of the parties' dispute is whether the legal point—*i.e.,* that the trial court should have instructed the jury that 10 of its members must agree on the state's theory of conspiracy—is "not reasonably in dispute."

On this record, however, we need not resolve that issue. Even assuming that the trial court committed error apparent on the face of the record, the question remains whether this court should exercise its discretion to correct the error, keeping in mind that our discretion should be exercised only "with utmost caution." *State v. Fults,* 343 Or 515, 522, 173 P3d 822 (2007) (quoting *Ailes v. Portland Meadows, Inc.,* 312 Or 376, 382, 823 P2d 956 (1991)). In determining whether to exercise our discretion, we consider

> "the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in the case in another way, *i.e.,* whether the trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error."

*Ailes,* 312 Or at 382 n 6 (citations omitted). In *Fults,* 343 Or at 523, the court listed several additional considerations, including whether there was a "possibility that [a] defendant made a strategic choice not to object" to the error.

Here, we find two related considerations to weigh most heavily in determining whether to exercise our discretion. First, although the claimed instructional error was not brought to the trial court's attention, defendant did make a related motion to require the state to elect a theory on its conspiracy charge. Thus, the trial court was presented, at least in some manner, with the fact that the state was offering two

different theories in support of its conspiracy charge. That, of course, weighs in favor of exercising our discretion.

On this record, however, that same fact—that defendant moved to require the state to elect—also cuts against our exercise of discretion. That is, defendant certainly was aware of the potential concurrence problem but nonetheless did not seek a jury concurrence instruction.

In light of defendant's inexplicable failure to address the jury concurrence issue at the end of the trial, we conclude that there is a distinct possibility that defendant made a strategic decision not to request that instruction. The presentation of the evidence at trial was, quite frankly, confusing as to what various parties knew and when they knew it. Defendant, for example, maintained throughout trial that she had never signed the title relinquishing her interest in the Camaro—contrary to her earlier admission and the testimony of a handwriting expert. And, in his closing argument, defendant's counsel continued to argue that defendant believed that she had a valid right to possess the car on October 31, 2001, and November 3, 2001 (the date of the storage agreement). Zanotto, on the other hand, argued that she had no knowledge that defendant had relinquished her interest by October 31, 2001, and that there was nothing "bogus" at all about the lien agreement—defendant was the registered owner and the lien was valid. The prosecutor, for his part, went back and forth as to what the parties agreed to do and, in closing argument, essentially conceded that Zanotto may not have had the requisite criminal intent to form a conspiracy on October 31, 2001.

Given the state of the evidence, defendant and Zanotto may have decided that the confused factual record and the ambiguity concerning the state's theory of conspiracy provided their best chance that a jury would find reasonable doubt. In fact, defendant's counsel argued to the jury:

> "[Y]ou are going to have to sort all of this out. It is your responsibility to determine who is credible, who is not credible, what the agendas of these individuals are and to make an ultimate determination. At this point, what [defendant] did and what [Zanotto] did are two different things. You

have to take them independent of each other and you have to come up with the decision."

Based on the theories that defendant and Zanotto pursued at trial—*i.e.*, that they both believed, throughout the fall of 2001, that defendant was the actual owner of the Camaro and had no fraudulent intent concerning the lien arrangement—a jury instruction that focused the jurors' attention on the facts surrounding the different agreements would not necessarily have been helpful to their cause. With regard to the October 31, 2001, agreement, the evidence was overwhelming that defendant lied about her interest in the vehicle on that date; with regard to the storage arrangement, the evidence strongly suggested that Zanotto lied about her intent. Defendant and Zanotto may have decided that, rather than focus the jury on either one of their respective mental states on a particular date, they were better off leaving the jury with a more impressionistic sense of their credibility and their intentions regarding the Camaro.

On balance, given the inherently strategic considerations involved in requesting jury instructions and the fact that defendant in this case was seemingly aware of a potential concurrence problem but did not request an instruction that addressed that issue, we will not exercise our discretion to correct any possible trial court error in failing to *sua sponte* instruct the jury.

D. *Fourth Assignment of Error*

■ In her fourth assignment of error, defendant argues that the trial court erred in imposing $2,000 in restitution for the loss of the Camaro. Defendant contends that, as a result of a "procedural oddity," defendant was a party to a small claims action filed by Howe and O'Neal regarding the Camaro before defendant was sentenced for her crimes. Defendant contends that she was "completely exonerated" in the small claims action and that the restitution award therefore "violated the principles of both *res judicata* and *collateral estoppel* that are applicable to criminal cases." (Emphases defendant's.)

In response, the state submits that the record does not demonstrate the basis on which the small claims court

disposed of the claims against defendant and, in the absence of such evidence, defendant failed to demonstrate that an award of restitution was precluded. We agree. At the sentencing hearing, defendant did not present any evidence regarding the nature of the claims against her or the basis for the court's judgment in the small claims action. Rather, she simply stated that the judge in the small claims action dismissed her from the civil case because O'Neal "didn't really believe that [defendant] knew where the car was, they just brought me in just in case." The evidence in the record before us is inadequate to demonstrate that the restitution award was precluded by the judgment in the small claims action. Accordingly, we reject defendant's fourth assignment of error.[7]

E.   *Fifth Assignment of Error*

Defendant also contends that, under *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004), and *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000), the court erred in ordering her to pay restitution based on facts that she did not admit and that were not found by a jury. Defendant concedes that she did not raise that issue below but asks us to review it as error apparent on the face of the record. This court, however, has previously held that imposition of restitution based on facts not found by a jury or admitted by a defendant is not error apparent on the face of the record. *State v. Travalini*, 215 Or App 226, 234, 168 P3d 1159, *rev den*, 344 Or 110 (2008).

Affirmed.

---

[7] As part of her fourth assignment of error, defendant raises an additional issue as to whether the value of the Camaro constituted "pecuniary damages" for which restitution was permissible. That issue was not raised below, and we will not address it for the first time on appeal.