Argued and submitted April 2, reversed and remanded with instructions to grant youth's motion to set aside the adjudication December 1, 2021

In the Matter of C. L. E.,
a Youth.

STATE OF OREGON,
*Respondent,*

*v.*

C. L. E.,
*Appellant.*

Lane County Circuit Court
08307J;
Petition Number 08307J02;
A171787

502 P3d 1154

Youth appeals a juvenile court order denying his motion to set aside his adjudication for acts that, if committed by an adult, would constitute attempted sexual abuse in the first degree. ORS 419C.615; ORS 163.427(1)(a)(A); ORS 161.405(1)(c). Youth contends that his adjudication was in violation of his state and federal constitutional rights because (1) youth was not competent to be adjudicated at the time that he entered his plea; and (2) youth's trial counsel rendered inadequate and ineffective assistance by failing to have youth's competency evaluated. *Held*: Trial counsel rendered constitutionally inadequate assistance of counsel by not having youth's competency evaluated before advising youth to enter a plea.

Reversed and remanded with instructions to grant youth's motion to set aside the adjudication.

R. Curtis Conover, Judge.

Christa Obold Eshleman argued the cause for appellant. Also on the brief was Youth, Rights & Justice.

Joanna Hershey, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Robert M. Wilsey, Assistant Attorney General.

Before Lagesen, Presiding Judge, and James, Judge, and Kamins, Judge.

LAGESEN, P. J.

Reversed and remanded with instructions to grant youth's motion to set aside the adjudication.

**LAGESEN, P. J.**

Youth, whose intellectual function is at a level equal to or better than only 0.5 percent of his peers, appeals from a juvenile court order denying his motion to set aside his adjudication for acts that, if committed by an adult, would constitute attempted sexual abuse in the first degree. ORS 419C.615; ORS 163.427(1)(a)(A); ORS 161.405(1)(c). Youth contends that his adjudication—which resulted from a plea—was in violation of his state and federal constitutional rights because (1) youth was not competent to be adjudicated at the time that he entered his plea; and (2) youth's trial counsel rendered inadequate and ineffective assistance by failing to have youth's competency evaluated. The juvenile court rejected those contentions but we conclude that trial counsel rendered constitutionally inadequate assistance of counsel by not having youth's competency evaluated before advising youth to enter a plea. Accordingly, we reverse the juvenile court's denial of youth's motion to set aside the adjudication and remand for further proceedings.

We review the juvenile court's determination for legal error and we are bound by the court's factual findings if they are supported by the evidence in the record. *State v. J. J.-M.*, 282 Or App 459, 461, 387 P3d 426 (2016). To the extent that the court did not make explicit factual findings, we presume that it would have found those facts consistent with its ultimate legal conclusions. *Id.*

In evaluating youth's contentions on appeal under ORS 419C.615, we apply the constitutional standards for inadequate and ineffective assistance of counsel that have been developed at the state and federal levels in the context of post-conviction and habeas corpus relief. *Id.* at 463 (citing *State ex rel Juv. Dept. v. Jones*, 191 Or App 17, 23, 80 P3d 147 (2003)). As relevant here, both Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution guarantee a criminal defendant the right to the adequate and effective assistance of counsel. *Montez v. Czerniak*, 355 Or 1, 6, 322 P3d 487, *adh'd to as modified on recons*, 355 Or 598, 330 P3d 595 (2014); *see also Strickland v. Washington*, 466 US 668, 686, 104 S Ct 2052,

80 L Ed 2d 674 (1984) (United States Constitution requires the "effective" assistance of counsel).

To prevail on his claims regarding the adequacy of counsel under the Oregon Constitution, youth must prove both that counsel "failed to exercise reasonable professional skill and judgment and that [he] suffered prejudice as a result." *Hale v. Belleque*, 255 Or App 653, 659, 298 P3d 596, *adh'd to on recons*, 258 Or App 587, 312 P3d 533, *rev den*, 354 Or 597 (2013) (citing *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991)). A functionally equivalent standard governs a claim of ineffective assistance of counsel under the Sixth Amendment. *Johnson v. Premo*, 315 Or App 1, 8, 499 P3d 814 (2021). We state the relevant facts, which are largely undisputed, in view of those standards.

Youth has spent most of his life within the jurisdiction of the juvenile court. Department of Human Services (DHS) became involved in youth's care shortly after he was born in 2000 due to concerns of neglect. Youth showed signs of slow development nearly from the beginning of his life. After living primarily under his grandmother's care, youth was placed in foster care when he was seven years old and was found to be within the court's jurisdiction in 2008. DHS removed him from his grandmother's and parents' care after determining that his parents' developmental disabilities interfered with their ability to care for their child, and that youth had special needs for which his parents and grandmother were unable to provide.

Youth consistently has been diagnosed as intellectually disabled since 2005. In 2008, youth was placed in skilled foster care where he could be treated for his ongoing aggressiveness. At that time, he was diagnosed with "Oppositional Defiant Disorder; Pervasive Developmental Disorder, NOS; Enuresis; Parent-Child Relational Problems; and Mild Mental Retardation." In 2009, an extensive evaluation was conducted which confirmed many of those diagnoses. Around this time, he scored between 51 and 68 on Full Scale IQ tests, which are tests commonly used to gauge an individual's cognitive functioning. Youth's scores reflected "extremely low" cognitive functioning.

Youth was arrested in 2014 and alleged to be within the juvenile court's delinquency jurisdiction for sexual misconduct. At the time of his arrest, youth was 13 and living in a "highly skilled foster home to help meet his developmental disability needs." The probable cause affidavit in support of the warrant for youth's arrest noted that youth was "seeing a psychologist who has diagnosed him as having a developmental disorder and that he functions at the level of an eight year old, that he has an unspecified impulse control disorder ***."

An attorney from the Public Defender Services of Lane County (PDS) was appointed to represent youth in the delinquency case; youth's lawyer in the dependency case worked in the same office. The delinquency attorney discussed the police reports with youth. She thought that youth "knew what [she] was talking about and he knew what he did." Based on those interactions, she did not question youth's competency and she did not seek to have it evaluated.

Prior to the appointment of counsel for youth's delinquency case, youth signed a handwritten note that detailed his allegedly delinquent actions, apparently obtained by a DHS investigator. More than a month after his attorney was appointed, youth entered an admission in juvenile court to Attempted Sexual Abuse in the First Degree. Based on that admission, the juvenile court took delinquency jurisdiction over youth. The same day that youth signed the admission in juvenile court, he also signed a juvenile case plan with a list of goals intended to "ensure community protection, fulfill obligations to the victim and community, clarify expectations and court ordered conditions, and help youth and family be successful." One goal indicated on this document is that youth "will participate in a mental health assessment and follow the recommendations of the treatment provider." There is no indication that such an assessment or further recommendations were undertaken in that time period. The juvenile court filed its judgment of jurisdiction and disposition about a week later, ordering up to five years of probation, continued supervision by Lane County Department of Youth Services, and registration with the Oregon State Police. Youth had turned 14 by the time of the adjudication.

Following his adjudication, youth's delinquency attorney and subsequent attorneys from PDS represented him through multiple probation violation proceedings until October 2018, when the office was permitted to withdraw from his representation due to a conflict. That conflict arose after one of his attorneys questioned youth's ability to understand the delinquency proceedings. The attorney sought an evaluation of youth's current competency, as well as a retroactive assessment of his competency at the time of adjudication. The evaluating psychologist concluded that youth lacked the abilities to understand the nature of legal proceedings, to assist and cooperate with counsel, and to participate in his own defense, and, "to a reasonable degree of certainty that if [the psychologist] had evaluated [youth] in 2014, [she] would have found him unfit to proceed." Given the evaluator's determination that youth had not been competent in 2014, and the conflict that created for PDS, which had represented youth at that time, new counsel was appointed to represent youth.

A different evaluation conducted in the same year by an Oregon Youth Authority psychologist reached a similar conclusion. It found that youth "does not understand situations clearly," and "does not understand a lot of the words that are presented to him and yet tries to appear knowledgeable." Around the same time, youth was given another Full Scale IQ test. His score was 61, placing him at the same level or better than only 0.5 percent of his peers. Youth's 2018 score was within the range of scores that resulted from his 2008 and 2009 testing.

In 2019, with the assistance of new counsel, youth petitioned for a juvenile court to set aside his 2014 adjudication under ORS 419C.615. Youth's new counsel alleged a substantial denial of youth's constitutional rights in the proceedings because youth was not competent at the time of adjudication and because he had received ineffective assistance of counsel due to his delinquency attorney's failure to investigate his competency at the time of his arrest, plea, and adjudication. After a hearing, the juvenile court denied the motion to set aside the adjudication.

In its order, the juvenile court found (1) that youth had not been unfit to proceed, and (2) that there had otherwise been no "substantial denial in the proceedings or of the youth's rights, pursuant to ORS 419C.615[.]" The court reasoned that the attorney's impressions at the time of the adjudication—through her observations of youth—were a more reliable indication of youth's competency than the 2018 psychological evaluation. The court also found that the record referenced a "decline" in 2016, whether behavioral or cognitive, making the 2018 evaluation less reliable. Finally, the court noted that youth had been before multiple judges for probation violation and other hearings between the 2014 adjudication and the post-conviction proceedings, and questions of his competency had not been raised at any point before 2018, inferring from that the absence of issues with competency. Based on those facts, the court concluded that youth had not demonstrated grounds to set aside the adjudication. Youth appealed.

On appeal, he contends that the juvenile court erred both in concluding that he was competent to enter an admission in 2014, and in concluding that his lawyer was not inadequate for failing to seek a competency evaluation. He also argues that, to the extent the juvenile court found that there had been a decline in his competency between 2014 and 2018, there is no evidence in the record to support that finding. The state responds that, given its factual findings, the juvenile court properly denied the motion.

We start and end with youth's contention that he is entitled to relief on his claim of trial counsel inadequacy, concluding that he is. Starting with the performance prong of youth's claim, the issue is whether the facts found below demonstrate that "counsel's decision reflects an absence of professional skill and judgment, a question that turns on the facts known at the time that counsel made that decision." *Davis v. Kelly*, 303 Or App 253, 262, 461 P3d 1043, *rev den*, 366 Or 826 (2020) (internal quotation marks and brackets omitted).

Applying that standard to the facts here, we conclude that trial counsel's failure to have youth's competency evaluated was not the product of reasonable professional

skill and judgment. In view of the performance standard for lawyers representing juveniles and the information about juvenile competency at the time, and in view of the specific information about youth available to counsel, counsel's choice to rely on her interactions with youth to evaluate competency reflects an absence of professional skill and judgment.

As an initial matter, in light of the standards for representing juveniles and the information available about juveniles' capacity for decision-making, given youth's age, the nature of the offense, and the lifetime consequences of admitting to a sex offense in the juvenile court,[1] it was not reasonable for counsel to base her assessment of youth's competency to enter a plea on her conversations with youth, standing alone. *See Restatement of Children and the Law* (Tent Draft No. 2) § 15.30 & comment d (Mar 20, 2019) (addressing the need for case-specific assessment of a juvenile's competency to be adjudicated delinquent, including need for assessing decision-making capacity in context of delinquency plea process); Oregon State Bar, *Report of the Task Force on Standards of Representation in Criminal and Juvenile Delinquency Cases* (OSB Standards) 18-20 (Apr 24, 2014) (listing the sources of information an attorney should consult when representing a juvenile, including school, mental health, medical, and other records).

To enter a valid admission or plea to delinquency jurisdiction, a youth "must be apprised of and understand the legal consequences of his admission of jurisdiction." *State ex rel Juv. Dept. v. Welch*, 12 Or App 400, 412, 507 P2d 401 (1973). Whether a youth is capable of the requisite understanding "should vary depending on the circumstances of the case, the age and intelligence of the child, as well as other factors which we decline to attempt to enumerate." *Id.*; *see* ORS 419C.378(1)(a) (youth may be unfit to proceed in delinquency proceeding if "as a result of a qualifying mental disorder or another condition" the "youth is unable * * *

---

[1] As a result of his admission, youth would be subject to lifetime registration as a sex offender, unless relieved of that obligation by the juvenile court. *Former* ORS 181.809 (2013), *amended by* Or Laws 2015, ch 820, § 8, *renumbered as* ORS 163A.025(2015), *amended by* Or Laws 2016, ch 95, § 1, *amended by* Or Laws 2019, ch 430, § 14.

[t]o understand the nature of the proceedings against the youth[.]"). Said another way, whether a juvenile is competent to knowingly and voluntarily enter a plea in the context of a delinquency proceeding, particularly where, as here, the plea will have long-term consequences, depends largely on the particular juvenile's developmental maturity, something difficult to assess without some expertise. *See, e.g.*, Exhibit 8, House Committee on Judiciary, HB 2836, Apr 9, 2013, at 6-7 (Juvenile Aid and Assist Report). As comment d to section 15.30 of the *Restatement* explains:

> "A key component of competence to make a consequential plea decision is future orientation, the ability and inclination to understand the future consequences of choices, and to weigh the available options adequately. If either acceptance or rejection of a plea decision can potentially impact the future life of the juvenile in harmful ways, it is important that the juvenile understand and consider those remote consequences. The developmental research indicates that this capacity improves over the course of adolescence. Younger adolescents are less inclined to consider future consequences than older adolescents and adults, and are more inclined to overvalue immediate consequences. Further, even when they do consider the future, younger adolescents are more likely to discount future risks and benefits and to focus on the short-term consequences of decisions."

Consistent with our long-ago recognition in *Welch* that, with a juvenile, competency might vary from case to case, the *Restatement* recognizes the equivalent point that the same youth may be competent to be adjudicated delinquent in some cases but not others: "Thus, an individual might be competent to proceed in a proceeding involving a minor offense with straightforward evidence, little procedural complexity, and modest sanctions who would be incompetent under other circumstances." *Restatement* (Tent Draft No. 2) § 15.30 & comment c. Consequently, the same youth may require a formal competency evaluation in some cases and not in others, depending on the complexity of the case and the available evidence of the youth's ability to understand that case.

While the contours of juvenile competency are highly context dependent, a lawyer's obligation to assess her

juvenile client's competency is unchanging. Said another way, while what is required to demonstrate juvenile competency may vary with the nature of a particular delinquency proceeding, a lawyer's obligation to evaluate competency against that relevant standard remains a constant. At the time counsel was advising youth in connection with his plea, a lawyer exercising reasonable skill and professional judgment would have recognized as much; that is, would have recognized that evaluating youth's competency to enter this plea required something more than talking with him like she would an adult. At the time, it was widely accepted that "juvenile defense [is] a specialized practice requiring specialized skills." National Juvenile Defender Center, *National Juvenile Defense Standards* (NJDS) 9 (2012). An Oregon State Bar Task Force had acknowledged "a growing recognition that the role of a juvenile defender is highly specialized and complex, requiring knowledge and skills unique to delinquency cases in addition to those required in adult criminal cases." OSB Standards at 2. Further, it was recognized that lawyers representing juveniles needed to be closely attuned to potential issues with competency that are not present with adult clients: "[l]awyers need to be especially sensitive to the competence of juvenile clients. Children may be incompetent for a variety of reasons." NJDS at 30; *see also* OSB Standards at 26 ("[A] client's ability to aid and assist in the proceedings may be compromised due to mental health disorders, developmental immaturity or developmental and/or intellectual disabilities.").

In addition to these standards, *Welch* and at least a decade's worth of available research would have alerted a reasonable juvenile attorney in counsel's position that the attorney needed to carefully assess whether her client was competent to proceed. It had been more than 40 years since we recognized that a youth's age and intelligence need to be taken into account in assessing whether the youth has the necessary level of understanding to enter an admission to delinquency jurisdiction. Petitioner was only 13 years old at the time of the conduct at issue, and 14 at the time of his plea. As petitioner points out here, more than 10 years before petitioner's plea, the MacArthur Foundation had concluded from a five-year study that "about one third of 11- to

13-year-olds and one-fifth of 14- to 15-year-olds probably are not competent to stand trial." Laurence Steinberg, *Juveniles on Trial: MacArthur Foundation Study Calls Competency into Question*, 18 Crim Just 20, 23 (Fall 2003). A 2005 guideline for evaluating youth competency produced as a result of that study noted that developmental immaturity, a fundamental difference between youth and adults, can have the same consequences on a youth's ability to meaningfully assist counsel and understand proceedings as mental illness in adults. Thomas Grisso, *Clinical Evaluations for Juveniles' Competence to Stand Trial: A Guide for Legal Professionals*, 40 (2005). That is because maturity impacts a youth's ability to make logical inferences and contemplate the consequences of their actions. Steinberg, 18 Crim Just at 23.

Finally, not only was the need for juvenile lawyers to exercise special attentiveness to issues of competency well known at the national level at the time of youth's adjudication, the unique task of representing youth—and the need to maintain a keen eye on the necessity for a formal evaluation of a young client's competency—had recently been addressed by the Oregon legislature, leading to HB 2836 (2013). The bill resulted from the distinction between youth competency and adult competency and the recognition that existing Oregon law on evaluating competency failed to provide for that distinction. *See* Exhibit 8, House Committee on Judiciary, HB 2836, Apr 9, 2013, at 3-5 (Juvenile Aid and Assist Report). The working group's report points out that with the introduction of HB 2836, later codified as ORS 419C.378, the main difference between competency law for adults and for youth is that finding an adult unfit to proceed may be based on "*a mental disease or defect*," whereas finding a youth unfit to proceed may be based on "*mental disease or defect or another condition*." *Id*. at 6 (emphasis in original). A primary condition uniquely relevant to juveniles, as discussed, is developmental immaturity. Furthermore, the working group's report, as reflected in the resulting law, highlights the importance of any party in a proceeding being able to raise concerns for a youth's competency and recognized that "only licensed psychiatrists, psychologists, or clinical social workers may conduct evaluations to determine a youth's fitness to proceed." *Id*. at 6-7.

Against that backdrop, and taking into account the specific facts about youth's developmental maturity that would have been readily available to counsel, counsel's decision to proceed without an even rudimentary investigation of youth's intelligence and decision-making capacity reflects an absence of professional skill and judgment. As noted, the probable cause affidavit, which all reasonable lawyers would have reviewed as a matter of course in evaluating their client's case,[2] stated that youth had been diagnosed as developmentally disabled and functioned at the level of an eight-year-old. Proceeding to a plea to facts constituting a felony sex offense without obtaining a competency evaluation, in the face of information that a client has the capacity of an eight-year-old, represents an absence of profession skill and judgment. There would have been very little reason to think that an eight-year-old would have had the necessary maturity to understand the consequences of the plea that youth accepted here, making it unreasonable for counsel to not have youth evaluated. Similarly, the other information available to counsel about her client through the dependency case—handled by her own office—leads to the same conclusion. That information, none of which points to youth having the ability to understand, in any meaningful way, the adjudicative process or the consequences of entering a plea to delinquency jurisdiction, also leads to the conclusion that counsel's failure to have youth's competency evaluated represents an absence of professional skill and judgment. Simply put, the information available gave no reason to think that youth was competent, and any lawyer exercising reasonable professional judgment would have looked into the issue further and would not have elected to evaluate the issue solely through discussions with youth.

---

[2] *See, e.g.*, OSB Standards at 19 ("A lawyer should obtain copies of all charging documents and should examine them to determine the specific charges that have been brought against the client. *** A lawyer should attempt to interview all law enforcement officers involved in the arrest and investigation of the case and should obtain all pertinent information in the possession of the prosecution, juvenile authorities, or law enforcement. *** Where appropriate, a lawyer should obtain school, mental health, medical, drug and alcohol, immigration, and prior criminal offense and juvenile records of the client and witnesses. *** A skilled and knowledgeable lawyer will be of little use to a client without a thorough understanding of the facts of a case.").

The remaining question is whether youth was prejudiced by counsel's failure. In cases where the adjudication is based on a plea, the prejudice requirement focuses on whether trial counsel's constitutionally inadequate performance affected the outcome of the plea process. *Moen v. Peterson*, 312 Or 503, 512-13, 824 P2d 404 (1991). To establish prejudice, the petitioner must show that but for the inadequate and ineffective assistance, he would have pleaded differently. *Green v. Franke*, 357 Or 301, 323 n 13, 350 P3d 188 (2015) (citing *Moen*, 312 Or at 513); *see also Trujillo*, 312 Or at 437 (framing prejudice inquiry in terms of whether the petitioner "would have withdrawn his plea" if counsel's advice had been adequate).

Here that standard is met. If the attorney had youth's competency evaluated, the record allows for one conclusion: youth would not have been permitted to enter his admission. *See Welch*, 12 Or App at 408 ("[A] juvenile can waive his [or her] constitutional rights if the waiver is knowingly, understandingly, and voluntarily made."). Every formal evaluation of youth's mental capacity contained in this record uniformly demonstrates that youth is low-functioning—including findings of a low vocabulary, concrete thinking,[3] and poor comprehension. For example, during youth's 2018 psychological evaluation—the only evidence in the record of an attempt to gauge youth's understanding of the proceedings—the doctor attempted to explain a plea bargain, and youth was unable to retain the concept. That discussion revealed that youth has no concept of what a "right" is and believed that he has to answer any "question the judge asks." Youth stated that "a plea of guilty is 'that you did it' and that not guilty 'is that you didn't do it.'" With regard to plea bargaining, youth conveyed that all choices led to going to "lock up." Given that measure of youth's understanding, counsel would have determined that youth was not competent or that there were such serious questions about competency, that counsel would not have permitted youth to enter his plea. Failing that, a juvenile

---

[3] The American Psychological Association defines concrete thinking as "thinking focused on immediate experiences and specific objects or events. It is characteristic of young children * * *." *APA Dictionary of Psychology*, https://dictionary.apa.org/concrete-thinking (accessed Nov 22, 2021).

court apprised of youth's level of comprehension would not have accepted youth's plea. Youth, therefore, was prejudiced.

In rejecting petitioner's claims, the juvenile court found that the record indicated that petitioner had suffered a cognitive decline between the time he entered his plea and the time his lawyer had his competency evaluated. That finding of a decline is not supported by the record. As noted, all formal evaluations of youth throughout his life have found him to be low-functioning, and his IQ score has remained relatively static across evaluations. The only evidence potentially showing that youth was competent to enter a plea is the evidence that the lawyers and members of the courts interacting with him did not detect any competency issues. But, as we have explained, the competency of a juvenile of youth's age to enter a plea with long-term consequences typically cannot be reasonably assessed from interactions with youth alone. The facts of this case, in particular, highlight the danger of relying on lawyer-client interactions alone to assess competency. The OYA psychologist who evaluated youth found that he "tries to appear knowledgeable" in contexts he does not understand, underscoring the need for lawyers representing him to dig deeper when assessing their clients' level of understanding. Some further investigation into a youth's capacity—such as consultation with educators or other persons familiar with the youth about the youth's intelligence and level of comprehension—is needed.

Reversed and remanded with instructions to grant youth's motion to set aside the adjudication.